THOMAS J. SCOLLANS *vs.* E. H. ROLLINS AND SONS.
SAME *vs.* SAME.

Suffolk.    March 19, 1901. — June 18, 1901.

Present: HOLMES, C. J., MORTON, LATHROP, BARKER, & LORING, JJ.

*Conversion,* Of non-negotiable security indorsed in blank. *Bailment.* *Evidence,* Relevancy. *Damages,* Interest.

If the owner of a registered city bond transferable only at the office of the city treasurer, having upon its back an assignment in blank executed and acknowl-

edged by its former owner, intrusts it to another for safe keeping, in a city where a usage exists to treat such bonds thus indorsed and acknowledged as the property of the bearer, and the person to whom it is so intrusted embezzles the bond and pledges it for his own debt, whereby it passes into the hands of a *bona fide* purchaser for value, *semble*, that the person thus intrusting the bond to another cannot recover its value from the *bona fide* purchaser.

The owner of a registered city bond transferable only at the office of the city treasurer, having upon its back an assignment in blank executed and acknowledged by its former owner, handed it to a stock broker, whom he was employing in buying and selling stocks, saying that he should like to leave it with him for safe keeping. The broker went with the bond into the next room where the safe was, and returned in a short time with a large envelope upon which were written the name of the owner of the bond and the words "Private Property." The broker then put the bond into the envelope and also at the owner's request put in an insurance policy, sealed the envelope in the owner's presence and carried it into the vault. Later the broker dishonestly pledged the bond for his own debt, and it came into the hands of a *bona fide* purchaser for value. *Held*, that there was no evidence of an intrusting of the bond to the broker, but that the transaction resulted in a bailment of a sealed envelope, the broker having no right to open the envelope after he had sealed it in the owner's presence and with his consent; therefore, that the owner was not estopped from asserting his title against the *bona fide* purchaser for value. HOLMES, C. J., not concurring on this point, although delivering the opinion of the court.

In an action for the conversion of a bond, the defendant introduced evidence for the purpose of showing that the bond was pledged as security by the plaintiff to certain brokers under whom the defendant claimed, and that the plaintiff's account with the brokers at that time was short. The plaintiff testified, that at no time had he been indebted to the brokers and that on one or two occasions during the period in question he lent the brokers money which was repaid by their checks. The plaintiff against the defendant's objection was allowed to put in evidence five checks from the brokers to him dated during the period in question. *Held*, that the checks tended as far as they went to corroborate the plaintiff's case and were admissible as against a merely general objection.

A plaintiff recovering judgment for the conversion of a four per cent bond is entitled to interest at the rate of six per cent per annum from the date of the writ.

TWO ACTIONS OF TORT originally brought in the Municipal Court of the city of Boston, each for the alleged conversion of a registered certificate of the city of Boston for the sum of $1,000 with an assignment on the back signed in blank by one William Scollans, the defendant, E. H. Rollins and Sons, being a corporation. Writs dated December 29, 1896.

The cases coming by appeal to the Superior Court, were tried before *Maynard*, J., who directed verdicts for the defendant, and allowed a bill of exceptions. The exceptions were sustained in a decision of this court reported in 173 Mass. 275.

At the new trial in the Superior Court, before *Stevens*, J., in addition to the facts which appeared at the former trial, the de-

fendant introduced evidence tending to show, that there was a settled usage or custom in the city of Boston, at the time of the transaction in question, among those dealing in certificates like those in the case at bar, to pass title to the same by delivery of the certificates with the assignment on the back executed and acknowledged by the person named in the certificate, but with the space for the transferee's name left blank, and to regard certificates so indorsed as assigned to bearer, and also that by this usage and custom certificates so indorsed passed from hand to hand without inquiry as to the title of intermediate holders.

The blank assignments executed by William Scollans on the certificates in the case at bar were executed by him and acknowledged before a justice of the peace as required by Pub. Sts. c. 77, § 6, and by the usage above stated.

The testimony of the plaintiff in regard to his delivery of the bonds, which was held by the court not to be an intrusting, was as follows: That on or about August 13, 1896, the plaintiff received from his father, William Scollans, the two bonds in question, and that his father gave them to him in settlement of a debt he owed him; that at first, after receiving the bonds, he went with his father to the office of Mr. Francis Burke, a lawyer, where his father acknowledged his signature to the assignments, and that the plaintiff then brought the bonds back and placed them in his desk; that several days after this he spoke about these bonds to one Gage, of the firm of Gage and Felton, employed by the plaintiff as brokers, saying that he should like to leave the bonds in the firm's safe for safe-keeping until he should want to use them; that Gage consented and asked for the bonds, and he, Scollans, handed them to him, and Gage went into the next room where the safe was, and returned in a short time with a large envelope upon which was written his, Scollans', name and the words "Private Property"; that Gage then placed the bonds in the envelope and was about to seal it, when he, Scollans, handed him an insurance policy and asked him to place that also in the envelope. That Gage did this, and the envelope was then sealed in Scollans' presence, and Gage carried it into the vault in which the safe was. The plaintiff testified that he knew Gage's reputation to be of the best and believed his character to be beyond question and that the per-

sonal relations between Gage and himself were those of very close friendship.

The plaintiff's counsel offered in evidence five checks drawn upon the Globe National Bank, made by Gage and Felton in August, 1896, payable to the order of the plaintiff, of the following dates and amounts: August 11, $1,500; August 13, $1,000; August 21, $412.50; August 21, $1,000; August 20, $775. No reference had been made to these checks by the plaintiff in his deposition, unless his testimony that he had made loans to Gage and Felton, which had been repaid by their checks, was such a reference, nor had he been asked in regard to them, nor was any witness asked with regard to them, nor were they referred to in any way in any of the accounts put in evidence. The signatures were genuine, and it appeared that they had gone in regular course through the clearing house, and it was agreed that they were obtained by the plaintiff's counsel from the assignee in insolvency of the firm of Gage and Felton. The defendant objected to the admission of these checks, but its objection was overruled and the checks admitted, and marked as exhibits, and the defendant excepted.

The plaintiff had testified that at this time the firm of Gage and Felton owed him several thousand dollars; that this indebtedness arose from their buying and selling stocks for him, and that the balance was always in his favor. He further testified that when Gage went into the firm of Gage and Felton he, Scollans, lent him $5,000, for which he held Gage's note, which was never paid. He testified that at no time had he become indebted to the firm of Gage and Felton.

In response to a cross-interrogatory, the plaintiff deposed: " On one or two occasions I made loans to the firm of Gage and Felton, I think between August 1 and November 1, 1896. I gave them my check for the various sums loaned, and they repaid me by their checks."

Gage had testified, for the defendant, that there was no time in August, 1896, when the plaintiff's account with Gage and. Felton was not behind three or four thousand dollars, and that the plaintiff gave them the two registered city of Boston certificates, registered in the name of William Scollans, and stated that they were to be used for margin on his account.

Gage and Felton pledged the certificates for their own debt, and they came to the defendant as a *bona fide* purchaser for value in the usual course of business, as stated in the opinion of the court.

The plaintiff offered no evidence to contradict the defendant's witnesses as to the existence of the usage stated above. The defendant thereupon asked the judge to rule, in both cases, that upon all the evidence the plaintiff could not recover and to order a verdict in each case for the defendant. The judge refused to rule as requested, and the defendant excepted. The defendant asked for various rulings as to the effect of the usage if found to exist, and as to the negligence of the plaintiff in intrusting the certificates to Gage, and also asked for a ruling that, if the jury found for the plaintiff, the measure of damages was the market value of the securities at the time of the alleged conversion and interest from that time at the rate of four per cent per annum.

The judge refused to give any of the rulings requested, and in his charge to the jury among other things instructed them as follows: " I instruct you, gentlemen, for the purposes of this case, that this was not a negotiable security, and the same rule of law applies to what we call personal property; that is, the title once being in Thomas J. Scollans, as it is admitted, in August, 1896, that title still remained in him, unless he did something himself to divest himself of that title.

" There has been considerable evidence about what the custom was, and perhaps I ought to say to you, gentlemen, that most of that evidence will be excluded. There was some claim that the plaintiff was negligent in having placed those certificates where it was possible for Gage and Felton to use them, and pass them over to somebody else, and that being guilty of such neglect, he would be estopped in setting up title to them if they afterwards got into the possession of any third party who was in the exercise of reasonable care and prudence when he took possession of the securities; and it was for that object that all that evidence was introduced — for the purpose of showing that the defendant was not guilty of negligence when it took these securities after they were sold to it by R. L. Day and Company, without having made any inquiry as to who the owner of them

was, but that evidence may be all excluded, because it is of no consequence; and I instruct you, that the plaintiff was not guilty of any negligence in doing what he did in relation to those certificates; so that the only question for you to consider is, whether or not those certificates were delivered by the plaintiff to Gage and Felton as collateral security, or whether they were simply placed in their safe for safe-keeping. That is the simple issue. The issue is a single one for you to pass upon, that is to say, whether or not the story of Gage is the one which you will adopt, or whether you will adopt the story of the plaintiff in what he says he did with those certificates."

The judge then proceeded to charge the jury, that, if they believed the plaintiff's story and found that the bonds had been given to Gage and Felton or to Gage for safe-keeping, they must find for the plaintiff in both cases; and, if they found that the bonds were given to Gage and Felton or to Gage as collateral security for the plaintiff's account, they must find for the defendant in both cases.

The judge further instructed the jury, that if they found for the plaintiff they should return a verdict in each case in the sum of $1,076.25, the admitted value of the bond at the time of the alleged conversion, with interest at the rate of six per cent per annum from the date of the writ.

The jury found for the plaintiff in both cases; and the defendant alleged exceptions.

*A. Hemenway & R. F. Sturgis,* for the defendant.

*J. E. Hannigan,* (*W. Wilson* with him,) for the plaintiff.

HOLMES, C. J. These are actions for the conversion of two certificates of indebtedness of the city of Boston, payable to William Scollans, and transferable only at the office of the city treasurer. On the back of each was an assignment in blank, executed and acknowledged by William Scollans, (see Pub. Sts. c. 77, § 6,) by virtue of which, coupled with a delivery of the instruments, the plaintiff became the owner. On the most favorable evidence for the plaintiff, as we must take the case, the plaintiff went to one Gage of the firm of Gage and Felton, bankers and brokers, and said that he would like to leave the certificates in the firm's safe-keeping. Gage consented and asked for the certificates, and the plaintiff handed them to him.

Gage went into the next room where the safe was, and returned in a short time with a large envelope, upon which was written the plaintiff's name and the words "Private Property." Gage then put the certificates into the envelope, sealed it, and carried it into the safe. Later the certificates were pledged by Gage and Felton for their debt, and were sold at auction in due course by the pledgee, and bought in the usual course and in good faith by the defendant. The case already has been before the court. 173 Mass. 275. The difference between its present aspect and that upon which the court has passed is that at this trial evidence was offered, in accordance with an intimation in 173 Mass. 279, of the usage of those engaged in the business of buying and selling such securities, which was intended to show that by their general understanding and practice such an indorsement in blank enabled the bearer to give a good title to a *bona fide* purchaser. The court ruled, however, that the only question for the jury to consider was another issue, which now is immaterial, as the jury found for the plaintiff upon it, and the defendant excepted.

A blank indorsement of such an instrument signifies that some person is expected to have the right to fill in the blank. On its face it does not indicate who that person is. By itself it is ambiguous. If, however, the general understanding of all concerned gives it a certain meaning, then it has that meaning by the same convention that gives a certain meaning to spoken or written words. The combination of words and blank is a sign as truly as a completed sentence, — a sign which conveys an idea as definitely as if the word "bearer" had been written in. The extent to which the owner shall be estopped by permitting the sign to remain upon the instrument in that form may be enlarged or limited by considerations of policy more or less articulate. No doubt, if such an instrument were stolen from the owner and indorser before his indorsement had become effective by a transfer or before the instrument had been put into other hands, even a *bona fide* purchaser would not get a title, and a different rule would be applied from that which is established in the interest of the currency with regard to bank notes used as money, and which might be extended to other bills and notes which are negotiable in the true sense. *Knox*

v. *Eden Musee Americain Co.* 148 N. Y. 441.   1 Morawetz, Corp. (2d ed.) § 190.   See *Wyer* v. *Dorchester & Milton Bank*, 11 Cush. 51; *Worcester County Bank* v. *Dorchester & Milton Bank*, 10 Cush. 488 ;  *Wheeler* v. *Guild*, 20 Pick. 545, 553 ; *Spooner* v. *Holmes*, 102 Mass. 503, 508.   But if the owner of the instrument intrusts it to another, he does so charged with notice of the power to deceive which he is putting into that other's hands, and if deception follows he must bear the burden.   *Colonial Bank* v. *Cady,* 15 App. Cas. 267, 278, 285, 286.   *Jarvis* v. *Rogers,* 13 Mass. 105 ; *S. C.* 15 Mass. 389.   *McNeil* v. *Tenth National Bank,* 46 N. Y. 325.   *Burton's appeal,* 93 Penn. St. 214.   *Pennsylvania Railroad's appeal,* 86 Penn. St. 80.   *Mount Holly, Lumberton, & Medford Turnpike Co.* v. *Ferree,* 2 C. E. Green, 117.   *National Safe Deposit, Savings & Trust Co.* v. *Gray,* 12 App. D. C. 276, 287.   1 Morawetz, Corp. (2d ed.) §§ 185–192.   See *White* v. *Duggan,* 140 Mass. 18, 20 ;  *Union Credit Bank* v. *Mersey Docks & Harbour Board,* [1899] 2 Q. B. 205 ;  *Pence* v. *Arbuckle,* 22 Minn. 417.   In this case, as in some others, it cannot be said that the owner is free from all obligation to contemplate the possibility of wrong-doing by a third person.   See *Glynn* v. *Central Railroad,* 175 Mass. 510, 511.

There is nothing in the judgment delivered in *Shaw* v. *Spencer,* 100 Mass. 382, contrary to what we have said.   The customary understanding as to the significance of an indorsement in blank could not relieve the taker from notice of a trust expressed on the face of the document, and of the consequence that the trustee had no power to pledge the instrument for his private debt.   So very possibly in the case of an indorsement by the executor of a registered holder.   *Colonial Bank* v. *Cady,* 15 App. Cas. 267. But see *Wood's appeal,* 92 Penn. St. 379.   Or by a guardian. *O'Herron* v. *Gray,* 168 Mass. 573.   Perhaps it may be as well to add that the usage supposed does not create a new class of negotiable instruments or attempt to enlarge the city of Boston's promise, as was attempted in *Partridge* v. *Bank of England,* 9 Q. B. 396.   It simply fixes the meaning of an ambiguous expression, for the purpose of determining whether it is open to the former owner to deny that the property in the paper and the equitable benefit of the promise have passed to another.

It follows from what we have said that if there was evidence

in this case that the plaintiff intrusted the instruments to Gage, and if there was evidence from which the jury would have been warranted in finding the supposed usage proved, the case should have been left to them upon those issues also, and the defendant's exceptions must be sustained.

There was evidence of the alleged usage.   Witnesses testified that certificates indorsed as these were " would be regarded as bearer's certificate passing by delivery from hand to hand "; that they " would be regarded as bearer's property the same as a coupon bond "; that they " were considered negotiable."   It is true that on cross-examination the witnesses admitted that if an unknown person came in with such instruments for sale they should take some measures to find out that they were dealing with a responsible man, but, apart from the fact that it always is for the jury to decide how far an absolute statement on direct examination shall be cut down by any qualification or contradiction elicited by the other side, *Purple* v. *Greenfield*, 138 Mass. 1, 7, the jury would have been warranted in regarding these admissions as simply expressing the natural caution of respectable business men who wished to avoid the possibility of question or of having anything to do with a questionable affair.   See *Danvers Bank* v. *Salem Bank*, 151 Mass. 280, 284 ; *Hinckley* v. *Union Pacific Railroad*, 129 Mass. 52, 58, citing *Miller* v. *Race*, 1 Burr. 452; also 2 Thomp. Corp. § 2589.

But my brethren are of opinion that there was no evidence that the instruments were intrusted to Gage.   It may be assumed that a delivery of possession for custody is a sufficient intrusting.   See *Hatfield* v. *Phillips*, 12 Cl. & Fin. 343, 360; *S. C.* 14 M. & W. 665, 670.   On the other hand if the certificates had been handed to him in a sealed envelope, they would not have been intrusted to him, and opening the envelope would have been like a carrier's breaking bulk.   The modern decisions have followed the ancient suggestion that in such cases there is no delivery of the contents of the enclosure.   Choke in Y. B. 13 Ed. IV. 9, pl. 5.   3 Inst. 107.   1 Hale P. C. 504, 505. *Belknap* v. *National Bank of North America*, 100 Mass. 376, 381. My brethren consider that the bailment to Gage in the form which it finally took was a bailment of the envelope under seal. In their opinion the transaction cannot be divided, and it does

not matter in what form it began. It was not complete until
the plaintiff saw the envelope sealed, after having asked Gage
to put an insurance policy into the envelope with the bonds,
thus showing that he contemplated and assented to the sealing
up which he saw was about to take place. They think it plain
that after the plaintiff had seen the envelope sealed and placed
in the safe and had departed Gage would not have been at lib-
erty to open the envelope, if, for instance, he found it more con-
venient for safe-keeping to put the bonds away unenclosed. I
have not been able to bring my mind to think that the jury
were not at liberty to take a different view, but upon that point
I stand alone.

An exception was taken to the admission of the checks made
by Gage and Felton payable to the order of Scollans. By way
of contradicting the defendant's evidence that the plaintiff's
account with Gage and Felton was short and that these instru-
ments were delivered to him as security, the plaintiff testified
that he lent them money on one or two occasions, which was
repaid by their checks. These checks were dated in August, a
month when by the defendant's evidence the plaintiff was heavily
indebted to Gage and Felton. They tended as far as they went
to corroborate the plaintiff's case, and were admissible as against
a merely general objection.

We see no reason for not allowing the ordinary rate of inter-
est after the plaintiff acquired a claim for money against the
defendant.

*Exceptions overruled.*